IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ALAN J. ROSS and                        )
SAVE ASSOCIATES,                        )
                                        )
            Plaintiffs,                 )
                                        )
    v.                                  )          Civil Action No. 12-102-LPS-CJB
                                        )
INSTITUTIONAL LONGEVITY ASSETS          )
LLC,                                    )
                                        )
            Defendant.                  )

## REPORT AND RECOMMENDATION

Plaintiffs Alan J. Ross and SAVE Associates ("Plaintiffs") filed this action for breach of

contract and related causes of action against Defendant Institutional Longevity Assets LLC

("ILA" or "Defendant"). Presently pending before the Court is Defendant's Motion to Transfer

Venue Pursuant to 28 U.S.C. § 1404(a) ("Motion to Transfer" or "Motion"). (D.I. 40)  For the

reasons that follow, the Court recommends that the Motion to Transfer be GRANTED.[1]

## I.    BACKGROUND

### A.    The Parties

Plaintiff Alan J. Ross ("Ross") is an individual residing in Newton, Massachusetts. (D.I.

---

[1]    There is a split of authority in the courts as to whether a motion to transfer venue
should be treated as a dispositive or non-dispositive motion. *See, e.g., Pragmatus AV, LLC v.
Yahoo! Inc.*, C.A. No. 11-902-LPS-CJB, 2013 WL 174499, at *1 & n.1 (D. Del. Jan. 16, 2013);
*see also McKee v. PetSmart, Inc.*, C.A. No. 12-1117-SLR-MPT, 2013 WL 1163770 (D. Del.
Mar. 20, 2013) (titling decision on motion to transfer venue as "Report and Recommendation"),
*report and recommendation adopted*, 2013 WL 2456719 (D. Del. June 5, 2013). There is,
however, recent precedent from our Court suggesting that such a motion is most properly treated
as not dispositive. *See, e.g., In re Heckmann Corp. Secs. Litig.*, C.A. No. 10-378-LPS-MPT,
2011 WL 1219230, at *1 (D. Del. Mar. 31, 2011). In an abundance of caution, the Court will
title this document as a "Report and Recommendation."

34 at ¶ 1) Plaintiff SAVE Associates is a sole proprietorship located in Needham,

Massachusetts. (*Id.*) Defendant ILA is a Delaware limited liability corporation with its principal

place of business in Chicago, Illinois. (*Id.*)

## B.     Factual and Procedural History

On May 27, 2008, Balshe LLC ("Balshe") and The Simon Law Firm ("SLF") filed a

complaint in the Circuit Court of Cook County, Illinois, County Department, Chancery Division,

seeking injunctive relief against Plaintiffs. Notice of Removal, *Balshe LLC v. Ross*, No. 1:08-cv-

03256 (D.I. 1 at ¶¶ 1-3) (N.D. Ill. June 5, 2008). The injunctive relief sought stemmed from

Plaintiffs' alleged attempt to transfer Patent No. 5,974,390 ("the '390 patent") to third parties in

violation of contracts between Plaintiffs, Balshe and SLF providing for transfer of the patent

from Plaintiffs to Balshe and SLF. *Id.*, ex. A at ¶¶ 2-4. Plaintiffs thereafter removed the case

(the "First Northern District Action") to the United States District Court for the Northern District

of Illinois ("the Northern District"). *Id.* at 1.

On June 20, 2008, the Northern District issued a temporary restraining order prohibiting

Plaintiffs, *inter alia*, from transferring any interest in the '390 patent to third parties. Temporary

Restraining Order, *Balshe LLC v. Ross*, No. 1:08-cv-03256 (D.I. 25) (N.D. Ill. June 20, 2008).

Thereafter, Balshe, SLF, Plaintiffs and the Meyer-Chatfield Corporation ("MC") reached an

agreement regarding the purchase of Plaintiffs' interest in the '390 patent (the "Settlement

Agreement"). *Balshe LLC v. Ross*, No. 08 C 3256, 2010 WL 3522945, at *1 (N.D. Ill. Sept. 2,

2010). Upon the parties' entry into the Settlement Agreement, the Northern District dismissed

the First Northern District Action with prejudice on July 1, 2008. Agreed Order of Dismissal

with Prejudice, *Balshe LLC v. Ross*, No. 1:08-cv-03256 (D.I. 31) (N.D. Ill. July 1, 2008).

2

As part of the Settlement Agreement, the parties agreed to form a new entity called Institutional Pooled Benefits LLC ("IPB"). *Balshe*, 2010 WL 3522945, at *1. However, negotiations between the parties regarding IPB's operating agreement broke down. *Id.* This prompted Plaintiffs to file a motion to compel compliance with the Settlement Agreement ("Motion to Compel Compliance") in the Northern District, which was later followed by Balshe and SLF filing their cross-motion to enforce the terms of the Settlement Agreement ("Cross-Motion to Compel Compliance"). Motion to Compel Compliance, *Balshe LLC v. Ross*, No. 1:08-cv-03256 (D.I. 32) (N.D. Ill. May 20, 2010); Memorandum of Law in Support of Cross-Motion to Compel Compliance, *Balshe LLC v. Ross*, No. 1:08-cv-03256 (D.I. 38) (N.D. Ill. July 6, 2010). The allegations in these filings related to disputes between the parties regarding the assignment and ownership of the '390 patent, the formation and operation of IPB and the execution of the terms of the Settlement Agreement. *Id.* Central to the litigation were disputes over the existence or meaning of several Settlement Agreement provisions, including those relating to shared expenses, procedures covering policy lapses, policy purchase rights, a "right to dissuade" clients or potential clients and certain bankruptcy provisions (collectively, the "disputed provisions"). Because the Order dismissing the claims in the First Northern District Action provided that the Northern District retained jurisdiction to enforce the terms of the Settlement Agreement, the parties simply re-opened the original caption of that action in litigating these disputes. (D.I. 13 at 4)

The Northern District considered the disputed issues raised by the parties, including the disputed provisions. Of those disputed provisions, the Northern District ultimately sided with Plaintiffs on only one—agreeing that IPB's operating agreement should not contain a provision

barring Plaintiffs' right to dissuade clients or potential clients. *Balshe*, 2010 WL 3522945, at \*3-

4. Importantly, the Court ordered Plaintiffs to transfer their remaining interest in the '390 patent

to IPB. *Id.* at \*4. Plaintiffs thereafter filed a motion for reconsideration in which they raised a

bevy of new issues and sought reconsideration of many issues addressed in the Court's earlier

Order. *Balshe LLC v. Ross*, No. 08 C 3256, 2011 WL 2669225, at \*2-8 (N.D. Ill. July 7, 2011).

The Northern District denied Plaintiffs' requested relief on every issue except for: (1) their

request (unopposed by Balshe and SLF) that one sentence in the previous Order's Statement of

Facts be slightly modified in a way that did not affect any prior ruling; and (2) their assertion that

the IPB operating agreement required Plaintiff Ross' signature (a requirement the Court labeled

"necessary, [but] merely a formality."). *Id.* Plaintiffs appealed the Northern District's Order to

the United States Court of Appeals for the Seventh Circuit. *Balshe LLC v. Ross*, 441 Fed. App'x

395 (7th Cir. 2011). On December, 8, 2011, the Seventh Circuit vacated the Northern District's

decision, stating:

> We cannot decide this issue on the merits, however, because the district
> court's attempt to retain subject-matter jurisdiction over this matter was
> ineffectual, a point we must raise sua sponte. A district court's original
> jurisdiction to entertain a lawsuit does not carry over to one party's later
> claim that the other has breached their settlement of that suit. Thus, when
> a suit is dismissed *with prejudice*, it is gone, and the district court cannot
> adjudicate disputes arising out of the settlement that led to the dismissal
> merely by stating that it is retaining jurisdiction. . . . This appeal, then,
> raises a claim that the district court was powerless to resolve without an
> independent basis of subject-matter jurisdiction. . . . This misstep might
> not have prevented the district court from going forward if a basis for
> exercising subject-matter jurisdiction was clear. But it was not. . . .
> Because the substance of the claim is breach of contract, the only possible
> basis for jurisdiction is diversity of citizenship, but we do not have
> complete information about the citizenship of the parties or the amount of
> money at stake when the parties filed their cross-motions to compel.

4

*Id.* at 396 (internal quotation marks and citations omitted) (emphasis in original). The matter was remanded to the Northern District with a directive that if a party later filed a new complaint alleging breach of the Settlement Agreement, subject-matter jurisdiction must be determined by the Court. *Id.* at 397.

On January 30, 2012—one day before the Northern District's scheduled status hearing to discuss the impact of the Seventh Circuit's ruling, (D.I. 13, ex. A at 1)—Plaintiffs filed this action. (D.I. 1) According to the Complaint, the breach of contract and other related claims against Balshe, SLF and MC "ar[ose] out of" the First Northern District Action. (*See id.* at 1) For example, the Complaint noted the dispute between the parties regarding the existence and meaning of the disputed provisions in the Settlement Agreement. (*Id.* at ¶ 20) The Complaint then included six counts of alleged wrongdoing, including breach of contract and related claims, nearly all of which are premised upon Plaintiffs' position as to the meaning or existence of the disputed provisions. (*See id.* at ¶¶ 24-53)

At the aforementioned status hearing in the Northern District, conducted on January 31, 2012, Plaintiffs, for the first time, notified counsel for Balshe and SLF that they had filed the Delaware Action. (*See* D.I. 13, ex. A at 2-3) Nevertheless, at this status conference, Balshe and SLF confirmed that they would file a new complaint against Plaintiffs in the Northern District. (*Id.* at 3) On February 10, 2012, Balshe and SLF filed that complaint (the "Second Northern District Action"), premised upon diversity jurisdiction. Complaint, *Balshe LLC v. Ross*, No. 1:12-cv-0966 (D.I. 1) (N.D. Ill. Feb. 10, 2012).[2] The complaint in the Second Northern District

---

[2] MC is also a party to the Second Northern District Action. The original complaint in that action named MC as a defendant. Complaint, *Balshe LLC v. Ross*, No. 1:12-cv-0966 (D.I. 1) (N.D. Ill. Feb. 10, 2012). An amended complaint, filed fourteen days later and before any

Action once again requests injunctive relief to prevent Plaintiffs from transferring any interest in the '390 patent to third parties, and also seeks remedies based upon Plaintiffs' alleged breach of the Settlement Agreement. *See id.* On their Civil Cover Sheet, Balshe and SLF indicated that the Second Northern District Action was a "refiling" of the First Northern District Action. *See* Civil Cover Sheet, *Balshe LLC v. Ross*, No. 1:12-cv-0966 (D.I. 2) (N.D. Ill. Feb. 10, 2012). Accordingly, the Second Northern District Action was assigned to the same District Judge who had handled the First Northern District Action. *See* Docket, *Balshe LLC v. Ross*, No. 1:12-cv-0966 (N.D. Ill.).

On February 28, 2012, in the Delaware Action, Balshe, SLF and MC filed a Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a), seeking transfer of the Delaware Action to the Northern District. (D.I. 12) Before briefing was complete on this motion, however, Plaintiffs filed an Amended Complaint on March 19, 2012. (D.I. 21)

Plaintiffs' Amended Complaint was largely similar to the original Complaint in the substance of its claims and factual allegations. (*Compare* D.I. 1, *with* D.I. 21) The named defendants listed, however, were entirely different. In the place of Balshe, SLF and MC, Plaintiffs listed IPB, ILA and MRB Pooled Benefits LLC ("MRB"). (D.I. 21 at 1) According to the Amended Complaint, Plaintiffs chose these new defendants because they are the "current rightsholders to the Settlement Agreement" at issue. (*Id.* at ¶ 1) ILA, according to Plaintiffs, obtained Balshe's interest in the Settlement Agreement in September 2008. (*Id.* at ¶ 6)

In light of certain jurisdictional issues apparent in the Amended Complaint and

---

responsive pleading, named MC as a plaintiff. First Amended Complaint, *Balshe LLC v. Ross*, No. 1:12-cv-0966 (D.I. 6) (N.D. Ill. Feb. 24, 2012).

uncertainty regarding Plaintiffs' intentions, on August 24, 2012, the Court issued an Order requiring Plaintiffs to file a Second Amended Complaint that clearly indicated which parties Plaintiffs intended to sue and the basis for the Court's jurisdiction (and requiring Plaintiffs to file notices of dismissal for those entities not listed in the Second Amended Complaint). (D.I. 32) On September 7, 2012, Plaintiffs filed their Second Amended Complaint, naming ILA as the only defendant, (D.I. 34); they also voluntarily dismissed, without prejudice, the claims against Balshe, SLF, MC, IPB and MRB, (D.I. 33). Despite altering the named defendants, the allegations and causes of actions in the Second Amended Complaint are virtually identical to those found in the original Complaint and the First Amended Complaint. (*Compare* D.I. 34, *with* D.I. 1, *and* D.I. 21)

After receiving indication that ILA also wished to move to transfer venue, (D.I. 38), the Court thereafter required ILA to file its own motion in that regard, so that a motion in its own name (containing clear indication of what ILA's own arguments were) was clearly set out on the record, (D.I. 39). ILA filed the instant Motion to Transfer on November 13, 2012. (D.I. 40)

In the Motion, ILA seeks a transfer to the Northern District. (D.I. 40 at 1) This Motion explicitly incorporates the arguments made in Balshe, SLF and MC's Memorandum of Law in Support of Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) and reply memorandum, (D.I. 13, 23), ILA's Motion to Extend the Time to Respond to the Second Amended Complaint, (D.I. 37), and ILA's Joinder in Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a), (D.I. 38).[3] The parties completed their briefing as to the Motion on November 28, 2012. (D.I. 45)

---

[3]     Though Docket Entries 13, 23, 37 and 38 pre-date ILA's Motion (and, in some cases, were filed on behalf of a group of defendants that did not include ILA), the Court granted ILA permission to incorporate the content of these filings into its Motion. (D.I. 39 at 2-3)

7

## II.    DISCUSSION

### A.    Legal Standard

Section 1404(a) of Title 28 provides the statutory basis for a transfer inquiry. It provides

that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may

transfer any civil action to any other district or division where it might have been brought or to

any district or division to which all parties have consented." 28 U.S.C. § 1404(a).

### 1.    Appropriateness of Transferee Venue

The first step in the transfer analysis is to determine whether this action could have been

brought in the proposed transferee venue. "The party moving for transfer bears the burden of

proving that the action properly could have been brought in the transferee district in the first

instance." *Mallinckrodt Inc. v. E–Z–Em Inc.*, 670 F.Supp.2d 349, 356 (D. Del. 2009) (internal

quotation marks and citation omitted). Here, there is no dispute that this action could have been

properly brought in the Northern District, ILA's principal place of business. (D.I. 44 at 1; D.I. 13

at 10); *see also* 28 U.S.C. § 1391.

### 2.    Applicable Legal Standards

"[S]ection 1404(a) was intended to vest district courts with broad discretion to determine,

on an individualized, case-by-case basis, whether convenience and fairness considerations weigh

in favor of transfer." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 883 (3d Cir. 1995) (citing

*Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 30-31 (1988)). Generally, Section 1404(a) is

"designed to prevent: (1) 'forum shopping' by plaintiffs who seek to avoid prior rulings or

governing precedents in other jurisdictions . . . (2) 'the waste of time, energy, and money,' and

(3) 'to protect litigants, witnesses and the public against unnecessary inconvenience and

8

expense.'" *MP Vista, Inc. v. Motiva Enters. LLC*, C.A. No. 07-099-GMS, 2008 WL 5411104, at

*2 (D. Del. Dec. 29, 2008) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964); *Yang v.

Odom*, 409 F. Supp. 2d 599, 605 (D.N.J. 2006)).

     The United States Court of Appeals for the Third Circuit has emphasized that when

considering a motion to transfer venue pursuant to Section 1404(a), "courts normally defer to a

plaintiff's choice of forum" and thus "the plaintiff's choice of venue should not be lightly

disturbed." *Jumara*, 55 F.3d at 879-80 (internal quotation marks and citation omitted). This

general principle, drawn from the historic respect accorded a plaintiff's choice of venue, suggests

that "a transfer is not to be liberally granted." *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d

Cir. 1970) (internal quotation marks and citation omitted).

     In the typical case then, the party seeking a transfer has the burden "to establish that a

balancing of proper interests weigh[s] in favor of the transfer[.]" *Id.*; *see also Jumara*, 55 F.3d at

879. That burden is a heavy one: "unless the balance of convenience of the parties is *strongly in

favor of defendant*, the plaintiff's choice of forum should prevail." *Shutte*, 431 F.2d at 25

(internal quotation marks and citation omitted) (emphasis added); *see also CNH Am. LLC v.

Kinzenbaw*, C.A. No. 08-945(GMS), 2009 WL 3737653, at *2 (D. Del. Nov. 9, 2009).

Accordingly, "transfer will be denied if the factors are evenly balanced or weigh only slightly in

favor of the transfer." *Angiodynamics, Inc. v. Vascular Solutions, Inc.*, C.A. No. 09-554-JJF,

2010 WL 3037478, at *2 (D. Del. July 30, 2010); *see also Illumina, Inc. v. Complete Genomics,

Inc.*, Civil Action No. 10-649, 2010 WL 4818083, at *2 (D. Del. Nov. 9, 2010).[4]

---

    [4]     The method of analysis for transfer motions differs a bit if the parties have
previously entered into a forum selection clause regarding litigation of the relevant dispute. In
such cases, a forum selection clause is "treated as a manifestation of the parties' preferences as to

The Third Circuit has observed that, in undertaking this transfer analysis, "there is no definitive formula or list of . . . factors to consider." *Jumara*, 55 F.3d at 879.   Instead, courts must analyze "all relevant factors" to determine whether "the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Id.* (internal quotation marks and citation omitted).   Nevertheless, in *Jumara*, the Third Circuit identified a set of private interest and public interest factors that should be taken into account in this analysis (the "*Jumara* factors").   The private interest factors to consider include:

> [1] [The] plaintiff's forum preference as manifested in the original choice,
> [2] the defendant's preference, [3] whether the claim arose elsewhere, [4]
> the convenience of the parties as indicated by their relative physical and

a convenient forum." *Jumara*, 55 F.3d at 880.   Though the existence of a forum selection clause "should not receive dispositive weight" in transfer analysis, "it is entitled to substantial consideration." *Id.* "Thus, while courts normally defer to a plaintiff's choice of forum, such deference is inappropriate where the plaintiff has already freely contractually chosen an appropriate venue." *Id.* In such a circumstance, it is the plaintiffs who "bear the burden of demonstrating why they should not be bound by their contractual choice of forum." *Id.*; *see also Cadapult Graphic Sys., Inc. v. Tektronix, Inc.*, 98 F. Supp. 2d 560, 567 (D.N.J. 2000).   It might be argued that paragraph 20 of the Settlement Agreement amounts to a forum selection clause. This paragraph, *inter alia*, states that the "parties agree that the Northern District shall retain jurisdiction to enforce or settle any disputes arising out of or relating to this Agreement and agree that they will not dispute jurisdiction in the Northern District."   (D.I. 1, ex. A at ¶ 20)   At a minimum, that clause indicates that the parties to the Settlement Agreement (including Plaintiffs) initially contemplated that any dispute arising out of that agreement would be resolved by one court—the Northern District—and that the Northern District could do so simply by "retain[ing] jurisdiction" over the matter as part of its efforts in the First Northern District Action.   Indeed, after a dispute arose, Plaintiffs immediately sought relief in the Northern District, for what they perceived to be violations of the Settlement Agreement relating to the purchase of their interest in the '390 patent.   However, ILA does not clearly argue that this wording amounts to a binding forum selection clause.   (*See* D.I. 13 at 1)   Nor does ILA address whether the clause is permissive or mandatory. *See, e.g., Mimm v. Vanguard Dealer Servs., LLC*, Civil Action No. 11-736 GMS, 2012 WL 4963315, at *6 & n.3 (D. Del. Oct. 16, 2012) (recognizing that a forum selection clause is afforded greater effect where the clause is mandatory, rather than permissive); *Mato v. Window World*, Civil Action No. 10-7617, 2011 WL 710473, at *3-4 (E.D. Pa. Feb. 28, 2011) (same).   In light of that, and in light of the nature of the Court's resolution of the Motion, the Court will not consider paragraph 20 to contain a forum selection clause for purposes of its analysis.

> financial condition, [5] the convenience of the witnesses—but only to the
> extent that the witnesses may actually be unavailable for trial in one of the
> fora . . . and [6] the location of books and records (similarly limited to the
> extent that the files could not be produced in the alternative forum).

*Id.* at 879. The public interest factors to consider include:

> [1] [T]he enforceability of the judgment, [2] practical considerations that
> could make the trial easy, expeditious, or inexpensive, [3] the relative
> administrative difficulty in the two fora resulting from court congestion, [4]
> the local interest in deciding local controversies at home, [5] the public
> policies of the fora, . . . and [6] the familiarity of the trial judge with the
> applicable state law in diversity cases.

*Id.* at 879–80.

## a.   Private Interest Factors

### i.   Plaintiff's choice of forum

When analyzing the first *Jumara* private interest factor—the "plaintiff's forum preference

as manifested in the original choice"—the court should not consider simply the fact of that

choice, but the reasons behind that choice. *Pragmatus AV, LLC v. Yahoo! Inc.*, Civil Action No.

11-902-LPS-CJB, 2012 WL 4889438, at *4 (D. Del. Oct. 15, 2012), *report and recommendation

adopted*, 2013 WL 174499 (D. Del. Jan. 16, 2013); *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp.

2d 192, 200 (D. Del. 1998). "If those reasons are rational and legitimate, then they will weigh

against transfer, as they are likely to support a determination that the instant case is properly

venued in this jurisdiction." *Pragmatus AV, LLC*, 2012 WL 4889438, at *4 (internal quotation

marks and citations omitted); *Intellectual Ventures I LLC v. Altera Corp.*, 842 F. Supp. 2d 744,

753 (D. Del. 2012). On the other hand, where a plaintiff's choice of forum was made for an

improper reason—such as where the choice is arbitrary, irrational, or selected to impede the

efficient and convenient progress of a case—it should not be afforded substantial weight.

*Pragmatus AV, LLC*, 2012 WL 4889438, at *4; *Affymetrix*, 28 F. Supp. 2d at 200 (noting that if a plaintiff had no good reason, or an improper reason, for filing suit in this District, this would likely weigh in favor of transfer).

Plaintiffs state that the "overriding reason" they brought suit in this District is because "it is the closest and most economically feasible forum to Plaintiffs['] domicile that undoubtedly, *given the fact ILA chose to be formed in Delaware*, exercises personal jurisdiction over the Defendant, in which this case <u>could</u> be brought[.]" (D.I. 44 at 3 (emphasis in original)) Plaintiffs explain that they might have preferred to sue ILA in the District of Massachusetts, where Plaintiffs reside, but that ILA is not subject to personal jurisdiction in that court. (*Id.* at 2-3)

Typically, a plaintiff's decision to file suit in the district in which a defendant is incorporated—a district where plaintiff can have some certainty that there will be personal jurisdiction over the defendant— is deemed a rational, legitimate choice. *Pragmatus AV, LLC*, 2012 WL 4889438, at *6 (citing cases). That choice has been noted to be particularly understandable where the district is in relatively close physical proximity to the plaintiff's place of business (here, Massachusetts). *Helicos Biosciences Corp. v. Illumina, Inc.*, 858 F. Supp. 2d 367, 369, 373 (D. Del. 2012) (finding that because plaintiff's principal place of business was in Massachusetts, a "venue close to" Delaware, plaintiff had a legitimate reason for filing suit in this District).

Here, however, Defendant has argued that Plaintiffs' filing is fueled by an "improper forum shopping motive." (D.I. 13 at 4-6, 12). For the reasons set out below, the Court agrees.

This conclusion is supported first by the timeline of events leading up to the filing of the Delaware Action. In that regard, the Court finds the case of *PhotoMedex, Inc. v. St. Paul Fire &*

*Marine Ins. Co.*, Civil Action No. 09-00896, 2009 WL 2326750 (E.D. Pa. July 28, 2009), particularly instructive.

In *PhotoMedex*, plaintiff, PhotoMedex, Inc. ("PhotoMedex"), filed suit against defendant, St. Paul Fire & Marine Insurance Company ("St. Paul"), in the United States District Court for the Eastern District of Pennsylvania. *Id.* at *1-2. In the ensuing litigation, the *PhotoMedex* Court decided an important choice of law issue in PhotoMedex's favor. *Id.* at *2. Before the case went to trial, however, the parties entered into a settlement agreement that did not preserve the right of St. Paul to appeal the court's choice of law decision. *Id.* at *2-3. Months after the parties entered into their settlement agreement, a related dispute arose. *Id.* at *3. Then, just two days after sending PhotoMedex a letter that would likely spur renewed litigation, St. Paul filed a state court complaint in California, seeking declaratory relief on the same choice of law issue previously addressed by the Eastern District of Pennsylvania in the earlier case. *Id.* Soon after, PhotoMedex filed a new action in the Eastern District of Pennsylvania, and St. Paul sought to dismiss or stay that action pursuant to the "first filed" rule. *Id.* at *3-4.[5]

The *PhotoMedex* Court held that even if the California action was considered the first filed case, the first filed rule should not apply, as St. Paul's conduct fell within the exceptions to the rule for bad faith and forum shopping. *PhotoMedex*, 2009 WL 2326750, at *6. Central to the court's holding was its finding that:

---

[5]     Generally, the first filed rule provides that where there are parallel proceedings in different courts involving the same issues, courts have the power to enjoin the second filed action in favor of the first. *See, e.g., E.E.O.C. v. Univ. of Pa.*, 850 F.2d 969, 971 (3d Cir. 1988). Exceptions to deference to the first filed action exist, however, in "extraordinary circumstances" or where a party is guilty of "inequitable conduct, bad faith, or forum shopping." *Id.* at 972.

> St. Paul's preemptive filing in California . . . illustrate[d] its desire to avoid
> the favorable ruling St. Paul suffered in [the earlier litigation in the Eastern
> District of Pennsylvania], as it is likely that PhotoMedex would have filed
> any action in this district (which PhotoMedex did eventually do). . . . . This
> procedural gamesmanship is classic forum shopping or forum avoidance. . .

*Id.; see also E.E.O.C.*, 850 F.2d at 972 (holding that district court did not abuse its discretion by

declining to invoke the first filed rule where filing party knew that opposing party would

imminently file an action in a district where precedent would be unfavorable).

Plaintiffs' actions here are very similar to St. Paul's actions in *PhotoMedex*, and militate

in favor of a similar finding of improper motive. Like St. Paul, Plaintiffs here received adverse

rulings from the Northern District, both in the form of a temporary restraining order and in that

court's ruling on the cross-motions to compel compliance with the Settlement Agreement (the

very document upon which this action is centered). After the Seventh Circuit issued its order

remanding the First Northern District Action to the Northern District, the court set a status

hearing for January 31, 2012. (D.I. 13, ex. A at 1) Just one day before this status hearing

occurred—where, predictably, the District Judge overseeing the matter instructed the parties that

future filings should "come to me as a related case," (*id.* at 2)—Plaintiffs filed this action in

Delaware, having given Balshe and SLF no advance warning of the filing (*id.* at 3; D.I. 1). With

this action, Plaintiffs seek a judicial decision regarding, *inter alia*, many of the same disputed

provisions of the Settlement Agreement that were previously before the Northern District (and on

which the Northern District had ruled against Plaintiffs). And, as in *PhotoMedex*, at the time

Plaintiffs filed this action, it was very likely that Balshe and SLF would soon file a new

complaint in the Northern District on related issues. In fact, Balshe and SLF did so less than two

weeks later, by commencing the Second Northern District Action on February 10, 2012.

Complaint, *Balshe LLC v. Ross*, No. 1:12-cv-0966 (D.I. 1) (N.D. Ill. Feb. 10, 2012).

If the procedural circumstances of this case did not conclusively indicate that forum

shopping was at play, any doubt is removed by a review of Plaintiffs' arguments to the contrary.

In their briefing, Plaintiffs make five points in an attempt to distinguish the subject matter of the

Northern District actions. Those arguments are strained at best; at their worst they defy credulity.

First, Plaintiffs assert that the portion of the First Northern District Action preceding the

Settlement Agreement was comprised of "completely unrelated claims[.]" (D.I. 44 at 4)  Yet this

argument is belied by Plaintiffs' Second Amended Complaint in the Delaware Action.  The first

sentence in that filing states that the Delaware Action "arises out of a multi-count case that was

filed by Balshe LLC and The Simon Law Firm . . . in the Circuit Court of Cook County, Illinois,

County Department, Chancery Division, on or about May 27, 2008[.]" (D.I. 34 at 1)  This Cook

County action is precisely the same action that Plaintiffs removed to the Northern District. *See*

Notice of Removal, *Balshe LLC v. Ross*, No. 1:08-cv-03256 (D.I. 1) (N.D. Ill. June 5, 2008).

The Second Amended Complaint also explains that the Settlement Agreement—the document

upon which this action is based—arose from the First Northern District Action. (D.I. 34 at 1)

The irrefutable link between the Settlement Agreement and the pre-Settlement Agreement

portion of the First Northern District Action demonstrates the relation of that litigation to the

Delaware Action.

Plaintiffs second argument is that the post-Settlement Agreement portion of the First

Northern District Action has "no relationship whatsoever to this case[.]" (D.I. 44 at 4)  Plaintiffs

provide no support for this statement, which is, on its face, simply false.  To the contrary, the

post-Settlement Agreement litigation in the First Northern District Action is very much related to

this action. Nearly every count in this action is based on alleged breaches of the Settlement

Agreement.[6] Moreover, the content of the Second Amended Complaint is nearly identical to

(and at times tracks word-for-word with) Plaintiffs' briefing of the Motion to Compel

Compliance filed in the First Northern District Action and, as previously noted, revolves around

many of the same disputed provisions of the Settlement Agreement that were at issue in the

Northern District.[7] Further, Plaintiffs do not allege that they learned any of the facts contained in

the Second Amended Complaint after the conclusion of the First Northern District Action. (*See*

D.I. 34 at ¶¶ 3-24) In fact, in the Second Amended Complaint, Plaintiffs only reference one

event that occurred after the May 20, 2010 date of filing of the Motion to Compel Compliance

—a February 24, 2011 phone call. (*Id*. at ¶ 27) The contents of this phone call, however, were

the subject of Plaintiffs' briefing in the First Northern District Action. *See* [Plaintiffs']

Recapitulation Memorandum in Support of [Plaintiffs'] Motion to Compel Compliance, *Balshe*

*LLC v. Ross*, No. 1:08-cv-03256 (D.I. 72 at 7) (N.D. Ill. May 6, 2011).

Third, Plaintiffs suggest that because the Seventh Circuit vacated the Northern District's

---

[6]     (*See, e.g.*, D.I. 34 at ¶ 28 ("Defendant's exclusion of SAVE from participating in the ownership of IPB, is a material and flagrant breach of Paragraph 1 of the Settlement Agreement" (Count 1)); *id*. at ¶ 36 ("The execution and hidden operation of the Secret September 2009 LLC Agreement was a willful, intentional and blatant breach of the Settlement Agreement" (Count 2)); *id*. at ¶ 41 ("Defendant has not cooperated in good faith and has breached the covenant of good faith and fair dealing by blatantly disregarding the specific and plain language of the Settlement Agreement" (Count 3)); *id*. at ¶ 51 ("Plaintiffs seek a declaratory judgment that a new entity has not been formed in the manner required by the terms and conditions of the Settlement Agreement" (Count 5)); *id*. at ¶ 54 ("Plaintiffs seek a declaratory judgment that the provisions referenced . . . are inconsistent with the terms and conditions of the Settlement Agreement" (Count 6)))

[7]     *Compare* Motion to Compel Compliance, *Balshe LLC v. Ross*, No. 1:08-cv-03256 (D.I. 32) (N.D. Ill. May 20, 2010), *with* (D.I. 34).

ruling on the parties' cross-motions to compel compliance with the Settlement Agreement in the

First Northern District Action, the First Northern District Action is "no longer relevant to this

action." (D.I. 44 at 4 n.2) The fact that the Northern District did not retain jurisdiction over the

parties after they entered into the Settlement Agreement, and that its *adjudication* of these issues

in the First Northern District Action was set aside as a result, does not mean that the *factual and

legal content* of the First Northern District Action is unrelated to that here. To the contrary, as

noted above, the matters are closely related.

Fourth, Plaintiffs argue that because the "Associated Cases" report available through the

electronic docket for the Second Northern District Action lists no cases as "associations," the

Northern District does not consider that case related to the First Northern District Action. (D.I.

44 at 4). As noted above, however, Balshe and SLF listed the Second Northern District Action

as a "refiling" of the First Northern District Action in their Civil Cover Sheet. Civil Cover Sheet,

*Balshe LLC v. Ross*, No. 1:12-cv-0966 (D.I. 2) (N.D. Ill. Feb. 10, 2012). Beyond the contents of

the electronic docket, the Northern District has acknowledged the relationship between the two

Northern District actions by assigning the same District Judge to both. Further, the Complaint

filed by Balshe and SLF in the Second Northern District Action asserts that they seek remedies

only in relation to: (1) their original agreement with Plaintiffs to purchase the '390 patent; and

(2) the Settlement Agreement. Complaint, *Balshe LLC v. Ross*, No. 1:12-cv-0966 (D.I. 1 at ¶ 2)

(N.D. Ill. Feb. 10, 2012). These are the same two documents that formed the basis of the claims

in the First Northern District Action.[8]

---

[8]     *See, e.g.*, Motion for Preliminary Injunction, *Balshe LLC v. Ross*, No. 1:08-cv-
03256 (D.I. 12 at 1) (N.D. Ill. June 9, 2008) (seeking temporary injunction barring Plaintiffs
"from transferring any interest in [the '390 patent]"); Memorandum of Law in Support of Cross-

Finally, Plaintiffs argue that because ILA is only a party in the Delaware Action, and not in either of the Northern District actions, the Delaware Action is unrelated to the Northern District actions. (D.I. 44 at 4)  That this distinction makes little difference in assessing the relationship between the matters is perhaps best made clear by Plaintiffs' own actions in this case. ILA was not a named defendant in the original Complaint filed in this case (Balshe, SLF and MC, parties to the respective Northern District actions, were instead). Indeed, Plaintiffs acknowledge that ILA is a party to this litigation only because Balshe allegedly transferred its interest in the Settlement Agreement to ILA in September 2008. (D.I. 34 at ¶ 6)  And though the named defendants in this case have changed as Plaintiffs have filed amended complaints, the underlying factual and legal content of those complaints have changed only slightly—further indicating that ILA's insertion into the Second Amended Complaint is of little moment in this analysis. (*Compare* D.I. 34 *with* D.I. 1 *and* D.I. 21)

For all of these reasons, the Court finds that the first private interest *Jumara* factor should weigh strongly in favor of transfer, as the filing of this action bears the hallmarks of classic forum shopping. *See Reiser v. RTI Int'l Metals, Inc.*, No. 1:08-cv-0729, 2009 WL 1097250, at *1 (S.D. Ohio Apr. 22, 2009) (noting that where a plaintiff's choice of forum is motivated by forum shopping, this militates in favor of transfer); *Deep v. XAC, LLC*, Civil Action No. 07-8-C, 2007 WL 1308356, at *3-4 (W.D. Ky. May 2, 2007) (same); *cf. Frank's Tong Serv., Inc. v. Grey Wolf Drilling Co., L.P.*, Civil Action No. H-07-637, 2007 WL 5186798, at *3-4 (S.D. Tex. Sept.

---

Motion to Compel Compliance, *Balshe LLC v. Ross*, No. 1:08-cv-03256 (D.I. 38 at 2) (N.D. Ill. July 6, 2010) (Balshe and SLF seeking ruling from the Northern District that Plaintiffs' proposed terms for IPB's operating agreement are "inconsistent with the terms of the Settlement Agreement.").

11, 2007) (finding that "[p]laintiff's choice of forum equitably weighs in favor of transfer" where an "aspect of forum shopping" was present).

### ii.   Defendant's forum preference

As for the second private interest factor, the defendant's forum preference, ILA prefers to litigate in the Northern District. (D.I. 13 at 6)  In analyzing this factor, our Court has also "tended to examine whether the defendant can articulate rational, legitimate reasons to support that preference." *Pragmatus AV, LLC*, 2012 WL 4889438, at *6.

Here, ILA argues that it has a number of legitimate reasons for seeking to transfer this action to the Northern District, including:  (1) many of the material events at issue occurred in that District; (2) most of the relevant witnesses and documents are located in that District; (3) the Northern District and Seventh Circuit have already spent significant judicial resources familiarizing themselves with and ruling on substantially identical claims; and (4) the Second Northern District Action—a "related action" to the First Northern District Action—is currently pending in the Northern District. (D.I. 13 at 6)  This Court has previously found such reasons (some of which will be discussed more fully below) to be legitimate bases for seeking to transfer a suit to a particular district. *See, e.g., Joao Control & Monitoring Sys., LLC v. Ford Motor Co.,* C.A. No. 12-cv-1479 (GMS), 2013 WL 4496644, at *4 (D. Del. Aug. 21, 2013); *Intellectual Ventures I LLC*, 842 F. Supp. 2d at 755.

Thus, the second private interest *Jumara* factor weighs in favor of transfer.

### iii.   Whether the claim arose elsewhere

The third private interest *Jumara* factor asks "whether the claim arose elsewhere." ILA states that the "relevant underlying acts" giving rise to Plaintiffs' claims "occurred primarily in

19

Chicago [located within the Northern District] and secondarily in New York. No relevant activity occurred in Delaware." (D.I. 13 at 13 & ex. 1 at ¶ 7)  ILA also states that the drafting and negotiation of the Settlement Agreement occurred in Chicago and Philadelphia, not in Delaware. (D.I. 13 at 8 & ex. 1 at ¶ 8)  Plaintiffs do not significantly dispute ILA's factual assertions. (*See, e.g.*, D.I. 20 at 6 (noting that negotiation and execution of the Settlement Agreement took place in Chicago, Philadelphia and Boston)).  Instead, in the section of their Answering Brief addressing the third private interest *Jumara* factor, Plaintiffs note that "[e]ssentially, this is a contract interpretation matter (governed by Delaware law) in which each party alleges breach by the other party." (D.I. 44 at 4)

Positions of both parties have support. In a breach of contract action, courts assessing a transfer motion tend to examine issues including (1) where the relevant contract was negotiated and executed; (2) where the contract was to be performed and (3) where the alleged breach occurred. *Advanced Techs. & Installation Corp. v. Nokia Siemens Networks US, LLC*, Civil Action No. 09-cv-6233 (FLW), 2010 WL 3522794, at *8 (D.N.J. Sept. 2, 2010); *see also Mimm v. Vanguard Dealer Servs., LLC*, Civil Action No. 11-736 GMS, 2012 WL 4963315, at *6 (D. Del. Oct. 16, 2012) (noting that because the proposed transferee district was the district where the agreement at the heart of a breach of contract dispute was signed, this weighed in favor of defendant's arguments for transfer). Here, again, there is no dispute that the events relating to the negotiation and alleged breach of the Settlement Agreement (except, perhaps, the formation of IPB in Delaware) occurred "elsewhere" from this District, and that some significant portion of those events occurred in the Northern District.

In at least one case, however, our Court has concluded that a contract action should be

20

viewed as arising in Delaware, based on the fact that the contract contained a Delaware choice of law provision. *See Guzzetti v. Citrix Online Holdings GmbH*, Civil Action No. 12-01152 GMS, 2013 WL 124127, at *6 (D. Del. Jan. 3, 2013). Here, paragraph 20 of the Settlement Agreement contains such a provision. (*See* D.I. 1, ex. A at ¶ 20)

On balance, in light of the fact that a substantial portion of the events relating to this contract dispute occurred in the Northern District (but taking into account the existence of the Delaware choice of law provision), the Court finds this factor to weigh in favor of transfer, though only slightly.

### iv.   Convenience of the parties as indicated by their relative physical and financial condition

In assessing the next private interest factor—"the convenience of the parties as indicated by their relative physical and financial condition"— this Court has traditionally examined a number of factors. These have frequently included: (1) the parties' physical location; (2) the associated logistical and operational costs to the parties in traveling to Delaware (as opposed to the proposed transferee district) for litigation purposes; and (3) the relative ability of each party to bear these costs in light of its size and financial wherewithal. *See, e.g., Microsoft Corp. v. Geotag Inc.*, 847 F. Supp. 2d 675, 678 (D. Del. 2012); *L'Athene, Inc. v. EarthSpring LLC*, 570 F. Supp. 2d 588, 595 (D. Del. 2008).

ILA is alleged to "resid[e] in Chicago, Illinois" and its Managing Member is alleged to be a "citizen of the State of Illinois." (D.I. 34 at ¶ 1) Yet ILA does little to explain the contours of its relative physical or financial condition, or how those factors relate to its ability to litigate in the Northern District (as compared to this District). Instead, ILA argues primarily in the

negative, asserting that it "has no connections with Delaware other than the fact that it is a

Delaware entity . . . [,] does not conduct substantial business in Delaware, and none of its

members are citizens of Delaware." (D.I. 40 at 2)  Elsewhere in its briefing, ILA argues that

"many of the relevant . . . witnesses . . . are located in Chicago," but ILA does not explain

whether these are party or non-party witnesses.  (D.I. 13 at 13)

      Plaintiffs, for their part, note that they are located in Massachusetts, and explain that

Delaware is the "closest and most economically feasible forum for [them] to bring this action."

(D.I. 44 at 5)  They note that "travel, meals and lodging expense to the Northern District

represents a substantial financial hardship" for Plaintiff Ross, and that the presence of nearby

family and the shorter travel make Delaware far more convenient for him.  (D.I. 20 at 11 (*cited in*

D.I. 44 at 5))  Plaintiffs, however, do not provide any further information about Plaintiff Ross'

relative financial status, such as material submitted by way of affidavit or declaration regarding

Plaintiff's ability (or inability) to easily bear the costs of litigation in the Northern District.

      The record as to this factor is sparse.  Each of the proposed court locations are closer to

one of the respective parties.  The Court is prepared to infer, based on the limited record before

it, only that it would be a bit more financially and logistically challenging for a *pro se* plaintiff to

litigate in a District moderately far away from his home than for a corporate entity to do so.  *Cf.*

*Manley v. Navmar Applied Scis. Corp.*, Civil Action No. 12-5493, 2012 WL 5588757, at *4

(E.D. Pa. Nov. 14, 2012) (finding this *Jumara* factor to favor *pro se* plaintiffs, and determining

that defendant, "as a corporation," was "more capable of shouldering the financial burden" of

cross-country travel).  In light of this, the Court finds this factor to weigh against transfer, albeit

only slightly.

###### v.    Convenience of the witnesses to the extent that they may actually be unavailable for trial in one of the fora

The "convenience of the witnesses" is the next factor, "but only to the extent that the

witnesses may actually be unavailable for trial in one of the fora." *Jumara*, 55 F.3d at 879. "[I]n

reviewing a motion to transfer, courts frequently look to the availability of witnesses as an

important factor, as it can be relevant to protecting a defendant's opportunity to put on its case

with witnesses who will appear in person at the trial." *ADE Corp. v. KLA-Tencor Corp.*, 138 F.

Supp. 2d 565, 569 (D. Del. 2001). In explaining how the concerns implicated by this factor

relate to the different types of witnesses who might testify at trial, this Court has noted:

> Party witnesses or witnesses who are employed by a party carry no weight
> in the 'balance of convenience' analysis since each party is able, indeed,
> obligated to procure the attendance of its own employees for trial. . . .
> Expert witnesses or witnesses who are retained by a party to testify carry
> little weight in determining where the 'balance of convenience' lies . . .
> because they 'are usually selected [on the basis] of their reputation and
> special knowledge without regard to their residences and are presumably
> well compensated for their attendance, labor and inconvenience, if any.' . . .
> Fact witnesses who possess first-hand knowledge of the events giving rise
> to the lawsuit, however, have traditionally weighed quite heavily in the
> 'balance of convenience' analysis.

*Affymetrix,* 28 F. Supp. 2d at 203 (citations omitted). Of particular concern, then, are fact

witnesses who may not appear of their own volition in the venue-at-issue and who could not be

compelled to appear by subpoena pursuant to Federal Rule of Civil Procedure 45. *ADE Corp.*,

138 F. Supp. 2d at 569.[9] Absent some indication that any such individuals would be unlikely to

testify in this District (or the Northern District), it is difficult for a party to credibly claim that

---

[9]    Our Court has noted that the practical impact of this factor is limited, in light of
the fact that so few civil cases today proceed to trial (and at trial, so few fact witnesses testify
live). *Intellectual Ventures I LLC*, 842 F. Supp. 2d at 757-58.

this factor should turn in its favor. *See, e.g., Pragmatus AV, LLC*, 2012 WL 4889438, at \*10-11; *Tessera, Inc. v. Sony Elecs. Inc.*, Civil No. 10-838 (RMB)(KW), 2012 WL 1107706, at \*6 (D. Del. Mar. 30, 2012) (citing cases); *ADE Corp.*, 138 F. Supp. 2d at 571.

With respect to witnesses, ILA argues only that "many of the relevant . . . witnesses . . . are located in Chicago," but provides no information as to who those witnesses are, whether they are party or non-party witnesses, or whether there is any indication that they would be unlikely to testify in this District. (D.I. 13 at 13) Plaintiffs, on the other hand, name one non-party witness who they "intend to call" and two others who they "possibly" may call—all of whom are officers or principals of former defendants in this case and who are said to reside "within approximately 50 miles" of this Court. (D.I. 44 at 5-6) Plaintiffs do not argue that these three individuals would not appear of their own volition the Northern District. Indeed, in light of the fact that the one highlighted witness who Plaintiffs "intend to call" (the CEO of MC) works for an entity currently litigating against Plaintiffs in the Second Northern District Action, it would appear unlikely that such a witness would take affirmative steps to avoid appearance in the Northern District.

With little in the record as to witnesses who would be unavailable in the fora at issue, and less still that is persuasive, the Court finds this factor to be neutral.

## vi.  Location of books and records

Next, the Court considers "the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." This factor is commonly given little weight, however, as technological advances have "shortened the time it takes to transfer information, reduced the bulk or size of documents or things on which information is

recorded . . . and have lowered the cost of moving that information from one place to another."
*Cypress Semiconductor Corp. v. Integrated Circuit Sys., Inc.*, No. 01-199-SLR, 2001 WL
1617186, at *3 (D. Del. Nov. 28, 2001) (internal quotation marks and citations omitted); *see also*
*Cellectis S.A. v. Precision Biosciences, Inc.*, Civ. No. 11-173-SLR, 2012 WL 1556489, at *6 (D.
Del. May 3, 2012); *ADE Corp.*, 138 F. Supp. 2d at 571 ("With new technologies for storing and
transmitting information, the burden of gathering and transmitting documents 3,000 miles is
probably not significantly more than it is to transport them 30 miles.").

ILA argues that this factor favors transfer because "many of the relevant . . . documents
are located in Chicago," but provides no information about what those books and records are, nor
why they could not be easily collected and transmitted for use in this District. (D.I. 13 at 13)
Plaintiffs acknowledge that some relevant books and records are located in Chicago, but state
that "[t]his is primarily a contract interpretation case and given the nature of the claims in this
case, the applicable documentation (primarily contractual or draft contractual agreements, a few
pages of tax forms and public records and email correspondence) is relatively minor, and could
fit into one briefcase or can easily be transported for presentation." (D.I. 44 at 6)

In light of the record before it, the Court agrees with Plaintiffs' assessment of the burden
associated with collecting and producing case-related documents. Thus, this factor is neutral.

### b.    Public Interest Factors

#### i.    Enforceability of judgment

Plaintiffs submit that this factor is neutral, and ILA does not address it. (D.I. 44 at 6)
The Court agrees that this factor is neutral.

### ii. Practical considerations that could make the trial easy, expeditious, or inexpensive

The Court next considers the "practical considerations that could make the trial easy, expeditious, or inexpensive." Here, the primary practical consideration at play is the prior existence of the First Northern District Action (and the currently pending Second Northern District Action).[10] In examining this *Jumara* factor, our Court has often cited the existence of related lawsuits in one of the fora at issue as being an important "practical consideration" to be taken into account. *Fuisz Pharma LLC v. Theranos, Inc.,* Civil Action No. 11-1061-SLR-CJB, 2012 WL 1820642, at *17 (D. Del. May 18, 2012) (citing cases).

ILA argues "[i]t would be a 'gross waste of judicial resources' for a court to start 'from scratch' when another judge has already 'ruled on the various dispositive motions and other legal issues in a matter substantially identical to the one before this Court.'" (D.I. 13 at 11 (quoting *Yang*, 409 F. Supp. 2d at 608)) According to ILA, transfer to the Northern District would make litigation "more easy, expeditious and inexpensive because the courts in Illinois have already spent considerable resources hearing testimony and determining the issues[.]" (D.I. 13 at 11)

In their Answering Brief, Plaintiffs nevertheless state they believe this factor weighs in their favor. (D.I. 44 at 7) In support, Plaintiffs argue that the Second Northern District Action is legally problematic and likely to be either dismissed or transferred to Delaware—suggesting that since the lawsuit would soon be thrown out or transferred, no practical weight should be given to

---

[10]     Although the Second Northern District Action was not filed until ten days after Plaintiffs initiated the Delaware Action, even at the outset of this lawsuit, the judicial economy benefits of having this matter litigated in the Northern District would have been well apparent. This is because, by that time, the Northern District had already achieved substantial familiarity with the matters at issue here from the First Northern District Action, and the likelihood that Balshe and SLF would file a new complaint in the Northern District was extremely high.

its current existence. (D.I. 44 at 7) The Northern District, however, has addressed Plaintiffs'

claims and found them without merit. *See* Minute Entry, *Balshe LLC v. Ross*, No. 1:12-cv-0966

(D.I. 59) (N.D. Ill. July 16, 2013) (denying Plaintiffs' amended motion to dismiss and request for

a transfer under Section 1404(a)).

The Court agrees with ILA. In doing so, it finds that both actions in the Northern District

are closely related to this action (*see* Section II.A.2.a.i, *supra*), and that transfer to the Northern

District is more likely to make future litigation "easy, expeditious, or inexpensive" because of the

clear familiarity that District has with the parties and issues involved. Thus, the second public

interest *Jumara* factor weighs strongly in favor of transfer.

### iii.     Administrative difficulties in getting the case to trial

The next factor is the "relative administrative difficulty in the two fora resulting from

court congestion." ILA does not appear to be arguing that this factor weighs in favor of transfer.

Instead, citing statistics on the time between the filing and disposition of an average civil case in

both courts at issue, it asserts only that a transfer "will not increase court congestion" in the

Northern District. (D.I. 13 at 12) Plaintiffs state that this factor is neutral. (D.I. 44 at 8) Thus, it

appears that the parties agree, as does the Court. This factor is neutral.

### iv.     Local interests in deciding local controversies at home

ILA argues that this "local interests" factor weighs in favor of transfer because ILA is

based in Chicago and related litigation occurred (and is occurring) in the Northern District. (D.I.

13 at 11-12) Also weighing a bit in favor of transfer is ILA's statement (largely undisputed by

Plaintiffs) that the relevant underlying acts giving rise to Plaintiffs' claims "occurred primarily in

Chicago" and that the drafting and negotiation of the Settlement Agreement occurred in part in

27

Chicago. (D.I. 13 at 8 & ex. 1 at 2); *see Nilssen v. Everbrite, Inc.,* No. Civ.A. 00-189-JJF, 2001 WL 34368396, at *4 n.6 (D. Del. Feb. 16, 2001); *Memminger v. InfoCure Corp.*, Civil Action No. 00-707-JJF, 2000 U.S. Dist. LEXIS 22077, at *17-18 (D. Del. Nov. 14, 2000).  With that said, there is little of record to allow the Court to gauge whether any local interest is of significant magnitude in the Northern District.

Plaintiffs, for their part, concede that this factor favors transfer, though they argue it should only weigh slightly in favor because:  (1) the Northern District actions "have no relationship to the claims in this case"; and (2) ILA chose not to incorporate in the Northern District. (D.I. 44 at 8)

The Court addressed Plaintiffs' first argument in Section II.A.2.a.i and found it to be without merit.  As to Plaintiffs' second argument, our case law carries with it some support for a related point—that ILA's incorporation in Delaware could be said to foster some type of local interest in Delaware as to the outcome of this dispute. *Autodesk Canada Co. v. Assimilate, Inc.*, No. 08-587-SLR-LPS, 2009 WL 3151026, at *9 (D. Del. Sept. 29, 2009) ("Delaware clearly has a substantial interest in addressing lawsuits brought against Delaware corporations.").  This interest, however, is counterbalanced here by the fact that ILA is headquartered in the Northern District. *See Intellectual Ventures I LLC v. Checkpoint Software Techs. Ltd.*, 797 F. Supp. 2d 472, 486 (D. Del. 2011); *Human Genome Scis., Inc. v. Genentech, Inc.*, C.A. Nos. 11-082-LPS, 11-156-LPS, 11-328-LPS, 2011 WL 2911797, at *11 (D. Del. July 18, 2011).

On balance, the Court agrees with ILA that this *Jumara* factor favors transfer, and with Plaintiffs that it does so only slightly.

28

v.      **Public policy of the fora**

ILA does not address the fifth public interest *Jumara* factor.  Plaintiffs, however, argue

that this factor is impacted by ILA's choice of Delaware as its state of incorporation, but

acknowledge that (perhaps in light of ILA's connection to the Northern District) this factor

simply "does not weigh in favor of transfer."  (D.I. 44 at 8)

Though the Court recognizes Delaware's policy of encouraging Delaware corporations to

use the courts of this State as a forum for resolving disputes, that policy has typically been

considered most relevant to a transfer analysis where the parties on both sides of the dispute were

Delaware corporations, or at least the party bringing suit was a Delaware corporation.  *See, e.g.,*

*Intellectual Ventures I LLC*, 842 F. Supp. 2d at 760 (dispute among Delaware entities); *Wacoh*

*Co. v. Kionix Inc.*, 845 F. Supp. 2d 597, 604 (D. Del. 2012) (noting limitation of policy where

plaintiff is not a Delaware corporation).

Here, it is only ILA that is a Delaware entity and it has expressed its choice not to avail

itself of Delaware as a forum.  Accordingly, the fact that ILA is incorporated in Delaware has

little bearing on this factor.  *See Wacoh Co.*, 845 F. Supp. 2d at 604 (finding public policy

argument to be inapplicable where "the corporation that has chosen Delaware is not a Delaware

corporation, and the corporations that might want to claim the benefits of being a Delaware

corporation do not want to do so in this case."); *cf. IPVenture, Inc. v. Acer, Inc.*, Civil Action No.

11-588-RGA, 2012 WL 3016958, at *8 (D. Del. July 24, 2012).

For these reasons, the Court finds that this factor is neutral.

### vi.     Familiarity of the trial judge with applicable state law in diversity cases

ILA does not address the sixth public interest *Jumara* factor. Plaintiffs, however, argue

that "[n]o Federal District is as equipped to adjudicate civil actions that are governed under

Delaware law than the Delaware District[,]" though again, they do not argue that this fact weighs

against transfer—only that it does not "weigh in favor of transfer." (D.I. 44 at 8)

Our Court has noted that, as a general matter, it is likely better equipped to interpret

Delaware law than might a court based in another State. *Guzzetti*, 2013 WL 124127, at *7; *Mitek*

*Sys., Inc. v. United Servs. Auto. Ass'n*, Civil Action No. 12-462 GMS, 2012 WL 3777423, at *8

(D. Del. Aug. 30, 2012); *Kurz v. EMAK Worldwide, Inc.*, 464 B.R. 635, 650 (D. Del. 2011). On

the other hand, in at least one case when the Delaware state law claims were deemed to be

"straight-forward[,]" our Court did not assign weight to this factor, assuming that either District

was equally capable of applying Delaware law. *See Cont'l Cas Co. v. Am. Home Assurance Co.*,

61 F. Supp. 2d 128, 132-33 (D. Del. 1999) (assigning this factor no weight, as to claims

regarding breach of contract and related tortious activity). Indeed, it is worth noting that in the

two opinions issued in the First Northern District Action, there is only one total reference to

Delaware law, and that reference is of no significance in that Court's analysis. *See Balshe*, 2011

WL 2669225, at *4 n.3 (mentioning in a footnote that both Illinois and Delaware have laws

similar to that of Pennsylvania—the law governing the MRB operating agreement—regarding the

defense of *ultra vires* against a third party).

Ultimately, the Court finds that here, this factor weighs against transfer, but only slightly.

30

### c.   Conclusion Regarding Impact of Transfer Factors

After weighing the various *Jumara* factors, the Court finds that they strongly favor

transfer.  Two of the *Jumara* factors—plaintiff's choice of forum and practical

considerations—weigh strongly in support of transfer.  One factor—the defendant's forum

preference—weighs moderately in favor of transfer.  Two other factors—whether the claim arose

elsewhere and local interests in deciding local controversies at home—weigh slightly in favor of

transfer.  On the other hand, only two of the *Jumara* factors—convenience of the parties and

familiarity of the trial judge with applicable state law in diversity cases—weigh against transfer,

and then, only slightly so.  The remainder of the factors are neutral.

In the end, even beyond the numerical compilation of the factors, the *relative strength* of

the factors in ILA's favor is compelling.  Where Plaintiffs have engaged in a fairly transparent

attempt to seek a new forum when an old forum became legally adverse to them, in a manner that

would waste judicial resources, the policies informing Section 1404 would be offended were the

case to remain in this District.

Thus, after considering all of the *Jumara* factors, I find that the balance of those factors

weighs strongly in favor of transfer.

## III.   CONCLUSION

For the foregoing reasons, I recommend that the Court GRANT the Motion.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections

within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the

loss of the right to *de novo* review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order In Pro Se Matters For Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: September 20, 2013

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE